<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

DYSHON RAGLAND,

                Petitioner,

        v.

THE ATTORNEY GENERAL OF THE
STATE OF NEW JERSEY, *et al.*,

                Respondents.

Civil Action No. 19-14136 (MAS)

**OPINION**

<u>**SHIPP, District Judge**</u>

      This matter comes before the Court on Petitioner Dyshon Ragland's ("Petitioner") petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254. (ECF No. 1.) Following an order to answer, Respondents the Attorney General of the State of New Jersey and Bruce Davis (collectively, "Respondents") filed a response to the Petition, (ECF No. 15), to which Petitioner replied. (ECF No. 29.) The Court also permitted Respondents to file a sur-reply. (ECF No. 33.) For the following reasons, the Court denies the Petition and denies Petitioner a certificate of appealability.

## I.      <u>BACKGROUND</u>

      In its opinion affirming Petitioner's conviction, the Superior Court of New Jersey, Appellate Division, summarized the factual background of Petitioner's conviction as follows:

> Tried by a jury, [Petitioner] was convicted of first-degree armed robbery, . . . first-degree conspiracy to commit murder, . . . first-degree murder, . . . second-degree possession of a weapon for an unlawful purpose, . . . third-degree aggravated assault, . . . third-degree conspiracy to commit witness tampering, . . . and third-

degree witness tampering.  After merger, [Petitioner] was sentenced to an aggregate term of imprisonment of sixty-two years . . . .

. . . [The following facts are] glean[ed] . . . from the trial record.  On February 27, 2008, certain members of the Bloods street gang–including [Petitioner], Niko Rossano, and Anthony Skyers–decided to get a meal at a Subway restaurant in Toms River. Rossano and [Petitioner] entered the Subway at approximately 5:50 p.m., whereupon Rossano recognized an employee, Quinton Allen, but did not acknowledge him.  Rossano also nodded to waiting-in-line customer Eric Berrios, who Rossano knew from living in the neighborhood and attending the same school.

When [Petitioner] reached the front of the customer line, Rossano observed him pointing a gun at the cashier, stating "Give me the money."  Rossano claimed that he "was in a daze" because he was unaware that [Petitioner] possessed a firearm and intended to rob the restaurant.

Allen recognized both Rossano and [Petitioner]; he went to high school with Rossano and grew up with [Petitioner] in the Winteringham Village neighborhood.  When questioned by police, Allen initially said that he did not know the individuals who had entered the Subway because he "didn't want to get involved" and was "afraid of what [Petitioner] could do."  Allen later pled guilty to hindering apprehension.

Three months later, on June 5, 2008, in the early evening, Lakewood police officers observed Skyers and two other individuals purchasing beer from a liquor store in downtown Lakewood.  Skyers appeared to be less than twenty-one years old, and the police officers arrested him for underage possession of alcohol.  His comrade, Warren Applegate, who was not a minor, also was arrested and charged with supplying a minor with alcohol, among other offenses. Applegate's charges required him to remain at the police station, while Skyers was immediately released with a summons.  During his encounter with the police at that time, Skyers was only questioned about his underage possession of alcohol, and nothing else.

According to Zenobia Jackson, [Petitioner]'s live-in girlfriend at the time, at approximately 5:30 or 6:00 p.m., Applegate's sister telephoned [Petitioner].  Although she could hear only one side of the conversation, Jackson heard [Petitioner] say, "I hope he didn't do what I think that he's done" and "if he did what I think he did, I'm just going to have to shut him up."  After the telephone conversation ended, [Petitioner] told Jackson that he was

2

referring to Skyers, who had just been "picked up and locked up by the police" along with Applegate. Also according to Jackson, [Petitioner] received other upsetting telephone calls about Skyers in which [Petitioner] stated that he was "just going to take care of the situation and eliminate the problem."

At approximately 7:00 p.m., [Petitioner] left Jackson's apartment, telling her that he was "going around the corner." Before leaving, he telephoned Chris Brown, a fellow Bloods street gang member, but Brown did not answer the call because he was working in Piscataway until approximately 8:00 p.m.

Just before 10:00 p.m., Brown encountered [Petitioner] at Jackson's apartment complex. After spending some time with [Petitioner] in Jackson's apartment, the men left and walked to Brown's car. Along the way, [Petitioner] told Brown "he had to show [him] Baby J," which was a reference to Skyers. Brown was already aware that [Petitioner] "didn't want [Skyers] . . . around" because Skyers had "snitch[ed] on the Subway robbery."

While Brown and [Petitioner] walked along an unlit wooded trail, [Petitioner] said he hoped "that Baby J's mother . . . finds the body." After walking some distance, Brown saw Skyers laying face down with a bullet hole in his head. Upon seeing Skyers's body, [Petitioner] told Brown that he "pulled the trigger once, . . . nothing came out, and then . . . Baby J . . . turned around and he . . . pulled again and shot." [Petitioner] also said, "this is what happens . . . to snitches."

On June 8, 2008, [Petitioner] surrendered himself to the Lakewood Police Department on an outstanding warrant for the Subway robbery. On the way to the county jail in an unmarked black Crown Victoria, one of the sheriff's officers assigned to the transport detail asked the other sheriff's officer if he knew any facts about a recent Lakewood homicide. When the second sheriff's officer indicated that he "didn't know any particulars about the incident," [Petitioner] leaned towards the vehicle's partition window, stating that Lakewood police "had me as the prime suspect in the shooting." [Petitioner] then asked two questions: "[H]ow can I be arrested for this crime when the only witness to the crime is dead?" and "[H]ow can I go on trial for this crime when my codefendant is dead?"

When one of the sheriff's officers asked, "who died," [Petitioner] said, "just read my shirt," which contained the words "R.I.P. Baby J" on the front and "Anthony" on the back. [Petitioner]

further volunteered that Skyers "was his brother and he was going to have [Skyers's] face tattooed on his arm."

Kevin Allman, an Ocean County sheriff's officer, fingerprinted [Petitioner] that day. In response to [Petitioner]'s question regarding whether he could be charged with a crime if the police did not have the weapon, Allman responded affirmatively. Allman testified that [Petitioner] replied that "he did not have the weapon anymore."

After waiving his *Miranda*[] rights, [Petitioner] gave an unrecorded statement to Toms River police detective Steven Lomer. According to Detective Lomer, [Petitioner] denied any involvement in the Subway robbery. [Petitioner] also stated "he was in charge of 200 Bloods" in the Lakewood and Toms River area, and a friend of Skyers.

While incarcerated, [Petitioner] telephoned his mother, Donna Looney, from jail. Four of those calls were recorded and played for the jury. In those calls, [Petitioner] asked his mother to have others talk to the Subway employee, Allen, requesting that he submit a statement to [Petitioner]'s lawyer that [Petitioner] was not at the scene of the Subway robbery.

While being held in the county jail on the robbery charge, [Petitioner] befriended Charles Anderson who had been incarcerated since April 2008 for charges related to a separate armed robbery, assault, and multiple weapon offenses. According to Anderson, [Petitioner] spoke about the Subway robbery and Skyers's murder multiple times. Anderson also claimed that [Petitioner] asked him to write a letter to the prosecutor, informing that an individual named D-Bow committed the murder. Instead of informing the prosecutor of that accusation, Anderson wrote a letter seeking to be released on his own recognizance in exchange for information about the Subway robbery and Skyers's murder.

After meeting with detectives, Anderson agreed to wear a wireless recording device so that further information could be collected directly from [Petitioner]. The detectives instructed Anderson not to discuss the Subway robbery with [Petitioner]. Additionally, they instructed him not to ask [Petitioner] questions, but merely "let him come to [you] . . . and talk." Anderson was not released on his own recognizance and returned to his original lodging in the jail.

[Petitioner]'s July 1, 2008, conversation with Anderson was recorded and played for the jury. During the conversation,

[Petitioner] denied committing the Subway robbery, stating that he did not fit the witnesses' description, and Rossano would not be able to identify [Petitioner] since they had just met, and Rossano would be afraid to testify against him.

With respect to Skyers's murder, [Petitioner] said it was "impossible" for him to be charged with that crime because he "was with [Brown] . . . for most of the night." Furthermore, [Petitioner] contended that there were three other potential suspects, and on the day of his arrest for the Subway robbery, [Petitioner] wore a t-shirt with Skyers's street name inscribed on it and acted distraught in the presence of the police about his death.

In October 2008, [Petitioner] confronted Anderson with what appeared to be a police report, stating that Anderson had told police that [Petitioner] committed the Subway robbery. [Petitioner] said if Anderson did not write a letter stating [Petitioner] had not committed the robbery, Anderson would be "food," meaning that he would be targeted for an assault or death. Feeling threatened, Anderson wrote a letter recanting everything he had told the prosecutor's office about [Petitioner], as well as the information contained in the "consensual intercept."

Jacarlos McKoy,[1] a fellow inmate with [Petitioner] and Anderson in the county jail, became a member of the Bloods street gang while incarcerated on October 31, 2008, but dropped out of the gang in 2010. McKoy testified that [Petitioner] approached him in the jail's recreation yard near the end of 2008 asking him "how . . . [McKoy] was living with a snitch?" [Petitioner] showed McKoy a paper suggesting that Anderson was cooperating with law enforcement authorities, and indicated that [Petitioner] would increase McKoy's rank in the street gang if he assaulted Anderson. McKoy recruited fellow inmate Jashon Brinson to help with the assault because Anderson was "not really a small guy."

On March 12, 2009, Brinson and McKoy assaulted Anderson. Anderson testified as follows: "[O]ut of nowhere I felt a sharp object and it punctured my lip, went through my lip, shattered my teeth and it knocked me on the floor. And [McKoy] proceeded to kick me, punch on me, they beat me up for like a half hour. I lost like a decent amount of blood." As sheriff's officers were rescuing Anderson, he saw [Petitioner] laughing at him and saying, "[H]ey, they got you, they got you, they F you up."

---

[1] McKoy's name is spelled both McKoy and McCoy in various portions of the record. For consistency's sake, this Court will use McKoy.

> After July 4, 2009, when [Petitioner] and McKoy were then housed together in the county jail, Ragland told McKoy that he "executed" Skyers with a revolver because he thought Skyers "was snitching about a Subway robbery."
>
> On September 22, 2009, an Ocean County grand jury issued a superseding indictment[] against [Petitioner] (and three others) for numerous crimes associated with the robbery at the Subway restaurant, the murder of Skyers, and the assault and witness tampering with respect to Anderson.   Prior to trial, [Petitioner] moved to suppress his oral statements to the jailhouse informant, Anderson, but the motion was denied.
>
> The trial comprised ten days of testimony.   At its conclusion, the jury convicted [Petitioner of the charges noted above].

(ECF No. 21-5 at 1-3.)

## II.   LEGAL STANDARD

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."   A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court.   *See Eley v. Erickson*, 712 F.3d 837, 846-47 (3d Cir. 2013).   Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts.   *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta," of the opinions of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III.   DISCUSSION

### A.   Petitioner's *Massiah* Claim

In his first claim, Petitioner contends that the state courts erred in declining to suppress recorded statements he made to Anderson, which he believes violated his *Massiah* rights. The Appellate Division rejected this claim, finding both that those rights had yet to attach at the time the recorded statements were made, as Petitioner had neither yet been indicted or sought counsel at the time of the recordings, and because the statements in any event did not violate Petitioner's rights as Petitioner made the statements voluntarily and without deliberate elicitation by Anderson. (*See* ECF No. 21-5 at 4-5.)

As the Supreme Court established in *Massiah v. United States*, 377 U.S. 201 (1964), and its progeny, the Sixth Amendment right to counsel protects criminal defendants from being forced to face agents of the state without the presence of counsel where those agents seek to deliberately elicit inculpatory statements. *See, e.g., Dellavecchia v. Sec'y Pa. Dep't of Corr.*, 819 F.3d 682,

693 (3d Cir. 2016).  Thus, in order to show a violation of one's rights under *Massiah*, a petitioner must show that the right to counsel under the Sixth Amendment had attached at the time of the event in question, an agent of the state or informant acting as an agent of the state was involved in the event, and the agent or informant sought to deliberately elicit incriminating information outside of the presence of counsel.  *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 892 (3d Cir. 1999).  A prerequisite to such a claim is the attachment of the Sixth Amendment right to counsel, which generally attaches "only at or after the initiation of adversary judicial proceedings," such as the levying of a "formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* (internal quotations omitted).  Even where the right has attached, no violation of a criminal defendant's rights will occur where an informant acting on behalf of the state records the defendant's unsolicited and spontaneous words and does not deliberately elicit inculpatory statements.  *Dellavecchia*, 819 F.3d at 694-95.  Where a criminal defendant voluntarily provides information about his offenses, "a state has no obligation to hinder him in making the statements and is not required to persuade an otherwise willing individual to remain silent."  *Id.* at 695.

In this matter, it is debatable whether Petitioner had reached a sufficient point in prosecution that his right to counsel under the Sixth Amendment had attached at the time of the recordings as he had yet to be indicted, seek counsel, or otherwise move towards adversarial criminal proceedings.  Even if one assumes that the right did attach, however, no violation of the *Massiah* doctrine occurred as a review of the recordings in question clearly indicates that Petitioner, and not the informant, initiated conversation and volunteered inculpatory information without any deliberate elicitation on Anderson's part.  Indeed, Anderson had been expressly told not to deliberately bring up the subject of Petitioner's charges and not to seek to elicit incriminating information, and had in any event not been promised any positive treatment from the State as a result of agreeing to record conversations with Petitioner.  Under the circumstances, the Appellate

Division's conclusion that Anderson did not deliberately elicit incriminating information from Petitioner was neither contrary to nor an unreasonable application of *Massiah* and its progeny, and Petitioner has failed to show a violation of his *Massiah* rights as a result. Petitioner's first claim thus serves as no basis for habeas relief.

### B.    Petitioner's Other Bad Acts Evidence Claim

In his next claim, Petitioner contends that the use of recorded jail calls between himself and his mother during which Petitioner sought to have his mother induce a witness against him to lie and to provide money to McKoy amounted to improperly admitted evidence of prior bad acts in violation of state evidentiary rules.  The Appellate Division rejected this claim, finding both that the testimony in question was relevant to, *inter alia*, Petitioner's cognizance of guilt and was otherwise admissible under state law.

Because "[t]he Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules," *see Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983), claims challenging the admissibility of testimony or other evidence are normally considered questions of state law which are not cognizable in habeas corpus. *See Keller v. Larkins*, 251 F.3d 408, 416 n.2 (3d Cir. 2001) ("A federal habeas court . . . cannot decide whether the evidence in question was properly allowed under the state law of evidence"); s*ee also Estelle v. McGuire*, 502 U.S. 62, 67-70 (1991); *Wilson v. Vaughn*, 533 F.3d 208, 213-14 (3d Cir. 2008), *cert. denied*, 556 U.S. 1170 (2009).  A habeas petitioner may therefore raise a habeas claim based on a state law evidentiary decision only where he can show that the admission of the evidence in question denied him Due Process under the Fourteenth Amendment by depriving him of the "fundamental elements of fairness in [his] criminal trial." *Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014) (quoting *Riggins v. Nevada*, 504 U.S. 127, 149 (1992) (Thomas, J., dissenting)). "The Supreme Court has 'defined the category of infractions that violate "fundamental fairness" very

narrowly, based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.'" *Id.* (quoting *Medina v. California*, 505 U.S. 437, 443 (1992)). "In order to satisfy due process, [Petitioner's] trial must have been fair; it need not have been perfect." *Id.* (citing *United States v. Hasting*, 461 U.S. 499, 508 (1983)). Thus, a Due Process violation will only occur in the context of a state court evidentiary ruling when that ruling was "so arbitrary or prejudicial that it rendered the trial fundamentally unfair." *Scott v. Bartkowski*, No. 11-3365, 2013 WL 4537651, at *9 (D.N.J. Aug. 27, 2013) (citing *Romano v. Oklahoma*, 512 U.S. 1, 12-13 (1994)).

The Supreme Court has never held that evidence of prior bad acts–even when they amount to other crimes–must be excluded from criminal trials, nor that a curative instruction or other restriction is per se required for a criminal conviction to survive constitutional scrutiny. *See Minett v. Hendricks*, 135 F. App'x 547, 553 (3d Cir. 2005). *See generally Estelle*, 502 U.S. at 62; *Greer v. Miller*, 483 U.S. 756 (1987); *Spencer v. Texas*, 385 U.S. 554 (1967). As with most state court evidentiary decisions, the admission of such evidence will only warrant habeas relief where the admission of the evidence was so unduly prejudicial that it rendered the petitioner's trial fundamentally unfair. *Glenn*, 743 F.3d at 407; *Minett*, 135 F. App'x at 553.

Here, the Appellate Division found the recorded calls admissible under state law as they were relevant to Petitioner's cognizance of guilt and relationship with McKoy leading up to the attack on Anderson and were more probative of Petitioner's guilt than unduly prejudicial. Having considered the calls in question, it is clear that they were relevant to Petitioner's case. The calls reflected that Petitioner was cognizant of his guilt in the robbery insomuch as he wished to dissuade a witness from testifying against him. The calls also reflected that Petitioner knew McKoy and fostered positive relations with him, which was probative of his guilt related to the attack on Anderson. Moreover, nothing Petitioner has submitted indicates that the admission of this

evidence was so unduly prejudicial that it rendered his trial fundamentally unfair, especially in light of the significant evidence of Petitioner's guilt presented at trial. As such, the state courts' refusal to suppress these recordings was neither contrary to or an unreasonable application of federal law, and this claim provides no basis for habeas relief.

### C.    Petitioner's Rebuttal Evidence Claim

In his next claim, Petitioner asserts that the state courts erred in permitting the state to call rebuttal witnesses to rebut the assertion that Thigpen, rather than Petitioner, had killed Skyers, as was suggested by the defense during the cross-examination of Christopher Brown. The Appellate Division rejected this claim, finding that: (1) Petitioner had opened the door to Thigpen's credibility by eliciting Brown to testify that Thigpen had claimed responsibility for killing Skyers; (2) the trial court had provided limiting instructions directing the jury to consider the rebuttal evidence for the limited purpose of evaluating the credibility of Thigpen's hearsay statement, and (3) the evidence was sufficiently probative in light of defense counsel's elicitation of a third-party guilt defense through Thigpen's hearsay statement. (ECF No. 21-5 at 7.)

As this claim challenges a state court evidentiary decision, it too may only serve as a basis for habeas relief if Petitioner shows that the admission of the evidence rendered his trial fundamentally unfair. *Glenn*, 743 F.3d at 407. There is no clearly established constitutional bar to the admitting of otherwise inadmissible evidence during a criminal trial to rebut any false impression given by a criminal defendant when he opens the door to an issue by eliciting it on cross-examination. *See, e.g., United States v. Chance*, 306 F.3d 356, 385 (6th Cir. 2002); *Gould v. Bonds*, No. 18-9406, 2019 WL 4785857, at *5 (D.N.J. Sept. 30, 2019). Having considered the rebuttal evidence in question, and as this Court agrees with the state courts that Petitioner opened the door by eliciting the hearsay statement on cross-examination regarding Thigpen claiming to have killed Skyers, the Court finds that the admission of the rebuttal evidence to permit the jury to

properly evaluate the credibility of that hearsay statement did not render Petitioner's trial fundamentally unfair. Indeed, to refuse to permit such rebuttal would have given Petitioner the unfair advantage of placing a third-party guilt defense into play without the risk of the credibility of the third-party ever being placed into contention. In light of the limiting instructions provided and Petitioner opening the door to the issue of Thigpen's credibility, the Court finds that Petitioner's rebuttal claim fails to state a valid basis for habeas relief. Thus, Petitioner's claim must be denied as the decisions of the state courts were neither contrary to nor an unreasonable application of applicable federal law and did not render Petitioner's trial fundamentally unfair.

### D.     Petitioner's Ineffective Assistance Claims

In his final series of claims, Petitioner asserts that his trial counsel did not adequately investigate several witnesses at trial, and that he believes had counsel done so, his trial may have led to a better result. The standard applicable to claims of ineffective assistance of counsel is well established:

> Claims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the

particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

Here, Petitioner chiefly asserts that counsel failed to perform adequate pre-trial investigations of the witnesses. As one court in this district explained,

In *Strickland*, the Supreme Court held that trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691. "The failure to investigate a critical source of potentially exculpatory evidence may present a case of constitutionally defective representation," and "the failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness." *United States v. Travillion*, 759 F.3d 281, 293 n.23 (3d Cir. 2014) (internal quotations omitted); *see also*

13

*United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989) (noting that a complete absence of investigation usually amounts to ineffective assistance because a counsel cannot be said to have made an informed, strategic decision not to investigate); *United States v. Baynes*, 622 F.2d 66, 69 (3d Cir. 1980).

Where a [p]etitioner can show that counsel's failure to investigate amounts to deficient performance, he must still show prejudice. In order to do so,

> a defendant basing an inadequate assistance claim on his or her counsel's failure to investigate must make "a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming admissibility in court, would have produced a different result."

*United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (quoting *Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir. 1987)); *see also United States v. Lathrop*, 634 F.3d 931, 939 (7th Cir. 2011) ("[w]hen a petitioner alleges that counsel's failure to investigate resulted in ineffective assistance, the petitioner has the burden of providing the court with specific information as to what the investigation would have produced"); *United States v. Green*, 882 F.2d 999, 1002 (5th Cir. 1989) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome" of [p]etitioner's case); *accord United States v. Garvin*, 270 F. App'x 141, 144 (3d Cir. 2008).

*Brown v. United States*, No. 13-2552, 2016 WL 1732377, at *4-5 (D.N.J. May 2, 2016).

Petitioner first claims that counsel failed to adequately investigate the backgrounds of Brinson and Mc[K]oy, which Petitioner believes would have revealed information to support his contention that Brinson and Mc[K]oy attacked Anderson without any direction from Petitioner, largely relying on a certification written by Brinson disclaiming knowledge of Petitioner prepared several years after Petitioner's conviction. The state courts rejected this contention, finding the alleged information immaterial and determining that Petitioner could show no prejudice from it as:

> Trial counsel had ample information with which he could or did cross-examine Brinson and Mc[K]oy, including: Brinson's two prior drug convictions; McKoy's pending murder charge; their admitted gang membership; their videotaped assault on Anderson; their motives to assault Anderson regardless of [Petitioner]; their pending criminal charges arising out of the assault; and their agreement to testify against [Petitioner] and plead guilty to some charges in return for the concessions by the prosecutor at their upcoming sentencings.    Indeed, trial counsel's efforts were sufficient to gain acquittals on the charges of second-degree assault on Anderson, and of witness tampering by employing or threatening force against Anderson or conspiring to do so.  [Petitioner] has failed to show a prima facie case that trial counsel was ineffective.

*State v. Ragland*, No. A-0747-16T2, 2018 WL 3596376, at *4 (N.J. Super. Ct. App. Div. July 27, 2018).  Having reviewed the record, this Court agrees that the result of Petitioner's trial would not have been different had counsel discovered the information in the Brinson certification–Brinson already testified that he acted at McKoy's behest and would have done so without any involvement by Petitioner, and counsel secured highly favorable results for Petitioner on this issue in any event. It is not likely that the certification or the information in it would have changed the outcome of Petitioner's trial and he therefore cannot show prejudice.  This claim therefore fails to set forth a valid basis for habeas relief.

Petitioner next asserts that counsel failed to discover that two witnesses against him–Zenobia Jackson and Jovina Vega–were paid relocation expenses by the state in relation to their testimony, asserting that such information could have aided in cross-examination of those two witnesses.  During his PCR proceedings, Petitioner raised this claim both as a claim for ineffective assistance and as a species of *Brady* claim, contending that this information had been improperly withheld from him.  The Appellate Division rejected the claim, finding both that trial counsel *had* requested such information, *see Ragland*, 2018 WL 3596376, at *5, and regardless of how Petitioner's claim was construed, the information was not material and thus was not prejudicial. The Appellate Division explained that conclusion as follows:

Trial counsel had ample ammunition for cross-examining [Jackson], including her gang membership; her long-held belief [that Petitioner] was innocent; her subsequent relationship with [Brown], who told her [Petitioner] was meeting with other girls after Skyers was killed; her repeated lying to police in her earlier statements; the police cursing at her and telling her people were after her and her children needed her; her delay of over a year in giving a statement inculpating [Petitioner]; her failure to tell her cousins and others what she was telling the jury; and her failure to disclose [Petitioner] was living with her to protect her subsidized housing and welfare payments.  Indeed, trial counsel cross-examined [Jackson] for over ninety-five pages.

Given this wealth of cross-examination material to show [Jackson] was a lying, jealous former girlfriend who was pressured by police, information that the State paid to relocate [Jackson] would have added little. . . .

Moreover, eliciting that the State paid to relocate [Jackson], "although possibly beneficial to [Petitioner], posed the clear risk of an adverse jury reaction." . . . . To explain why she had withheld inculpatory information for over a year, the prosecution elicited from her that she "was kind of afraid."  On cross-examination, defense counsel got her to admit that [Petitioner had] never threatened her or told her not to talk to anyone.  To elicit that State found it necessary to pay to relocate her would risk confirming that she was really afraid of retaliation by [Petitioner].  Not only would that aid the credibility of her final statement inculpating [Petitioner], but it would paint [Petitioner] in a bad light and corroborate that he would retaliate against those who snitched against him, which was the theory of why he murdered Skyers and went after Anderson.

Moreover, the other evidence against [Petitioner] was strong.  The other juvenile with [Petitioner] in the Subway, and a customer, identified him as the robber.  [Brown] testified how [Petitioner] showed him Skyers's body, and how [Petitioner] admitted he killed Skyers for snitching that he committed the robbery.  Anderson testified that [Petitioner] confessed to the robbery and the murder.  The recording of their conversation was incriminating.  Anderson, McKoy, and Brinson testified how [Petitioner] sought to retaliate against Anderson.  Finally, [Petitioner] made incriminating remarks to the police.

Thus, even assuming that the State paid to relocate [Jackson], and that information was not disclosed to or unearthed by defense counsel, [Petitioner] has not shown a prima facie case that there was a reasonable probability the result of the trial would have

been different if defense counsel had elicited that the State paid to relocate [Jackson].

[Petitioner] also cannot show that the verdict would have been different if defense counsel had elicited that the State paid to relocate [Vega].    [Vega] gave very brief testimony.    She did not know [Petitioner] or other witnesses in his trial.    She testified that Thigpen told her he lured a "boy" into the woods and shot him twice because he ratted on "D-Block," [a nickname for Petitioner], but she did not know that Thigpen committed the murder, defense counsel on cross-examination did not try to discredit [Vega].    Rather, he elicited that [Vega] "didn't hold anything back" from the police, that Thigpen "was telling her what he honestly believes," and that Thigpen told her he was alone when he committed the murder, D-Block was locked up at the time, and D-Block was not part of the conversation about whether to shoot the boy.

To elicit that the State paid to relocate [Vega] to discredit her would have undermined her testimony that [Petitioner] was uninvolved in the murder.    It could also have had the same adverse jury reaction.

*Id.* at 6-7.

The Appellate Division's conclusion was neither contrary to nor an unreasoanble application of *Strickland* and its progeny.[2]    As noted, the information in question was of at best

---

[2] In his habeas petition, Petitioner did not try to raise the claim as a *Brady* violation.    In his reply, counsel belatedly attempts to resurrect the claim under *Brady*. (*See* ECF No. 29 at 2.)    Even if the Court were to consider the late-raised *Brady* claim which was raised here for the first time in reply, the Appellate Division's conclusions do not amount to an unreasonable application of *Brady* and its progeny as the Appellate Division found the information in question to be immaterial–it was at best cumulative and highly risky to the extent it was aimed at Jackson, and was either irrelevant or actively damaging to his case insofar as it related to Vega.    As the information was at best cumulative, there is no reasonable likelihood that the outcome of the case would have been different had the information been available and used by defense counsel, and the information was therefore not sufficiently material to support a *Brady* claim.    *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 432 (1995) (*Brady* claim requires showing that the state suppressed material evidence which was favorable to the defense); *United States v. Bagley*, 473 U.S. 667, 682 (1985) ("evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.").    The Appellate Division's rejection of the claim insomuch as it was raised under *Brady* was thus neither contrary to nor an unreasonable application of federal law, and thus provides no basis for habeas relief even had the *Brady* aspect of the claim been properly raised.

17

marginal cumulative value in impeaching Jackson and carried a great risk of leading the jury to conclude that Jackson believed Petitioner to be a threat to her safety. Such a conclusion would be of no benefit to Petitioner, and the fact that she received relocation funds would have been of little benefit in light of the significant efforts counsel already made to impeach her credibility and the great strength of the considerable evidence against Petitioner. There is simply no reasonable likelihood that the outcome of trial would have changed had counsel been able to raise the relocation funds issue as to Jackson. Turning to Vega, as the Appellate Division noted, it was not in any way in Petitioner's interests to call her credibility into question through the raising of the issue. Such a credibility attack would have actively hindered counsel's strategy of using her to suggest Thigpen's guilt over Petitioner's, all while carrying the same potential negative inferences regarding Petitioner had the jury learned witnesses feared him enough to seek relocation. All considered, there is no reasonable likelihood of a different outcome at trial had counsel raised these issues, and there is a significant likelihood that the information would have hurt Petitioner's case further. Petitioner thus failed to show prejudice, and his ineffective assistance of counsel claim serves as no basis for habeas relief.

In his final claim, Petitioner asserts that counsel was ineffective in allegedly failing to acquire the unredacted recordings of Petitioner's conversations with Anderson, only portions of which were played at trial. The Appellate Division rejected this claim as Petitioner failed to provide any affidavits, certifications, or other evidence which indicated that any redacted portions of the recordings or testimony regarding the reliability or identity of those who had been recorded would have been of any benefit to him at trial. *Ragland*, 2018 WL 3596376, at *4. That same failure exists in his habeas petition. Petitioner identifies no portions of the unredacted recordings that he attempts to show were both admissible or relevant at trial, nor does he indicate what evidence or witnesses–expert or otherwise–a review of any unredacted recordings would have led

to at trial. Petitioner has thus failed to make a showing of how further investigation would have affected the outcome at trial and assumes, rather than shows, any prejudice. As Petitioner has failed to show how the outcome of his trial would have been likely to change had further investigation been conducted as to the recordings and does not otherwise show how he was prejudiced by counsel's alleged failure, he fails to make out a prima facie showing of ineffective assistance of counsel. The rejection of Petitioner's final claim by the state courts was thus neither contrary to nor an unreasonable application of *Strickland*, and serves as no basis for habeas relief. As all of Petitioner's claims are clearly without merit, Petitioner's habeas petition is denied.

## IV.    <u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude [that] the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because Petitioner's habeas claims are without merit for the reasons set forth above, he has failed to make a substantial showing of a denial of a constitutional right, and his petition is not adequate to receive encouragement to proceed further. This Court therefore denies Petitioner a certificate of appealability.

## V.   <u>CONCLUSION</u>

In conclusion, Petitioner's habeas petition (ECF No. 1) is **DENIED**, and Petitioner is

**DENIED** a certificate of appealability.  An appropriate order follows.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE